Slip. Op. 10-64

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BP PRODUCTS NORTH AMERICA INC., | : |
| Plaintiff, | : |
| v. | : Before: Jane A. Restani, Chief Judge |
| UNITED STATES, | : Court No. 06-00184 |
| Defendant. | : |

## OPINION

[In Customs classification matter the court denies Plaintiff's motion for summary judgment and grants Defendant's cross-motion for summary judgment.]

Dated: June 1, 2010

Phelan & Mitri (Michael Francis Mitri and Christopher Eduard Pey) for the plaintiff.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Justin Reinhart Miller and Mikki Cottet); Paula S. Smith, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of counsel, for the defendant.

Restani, Chief Judge: This matter is before the court on cross-motions for summary judgment by Plaintiff BP Products North America ("BP"), an importer of merchandise for use in the production of commercial-grade unleaded gasoline, and Defendant United States ("the Government") pursuant to USCIT Rule 56. The Government asserts that the United States Bureau of Customs and Border Protection ("Customs") properly classified the subject merchandise as preparations under subheading 2710.11.15 of the Harmonized Tariff Schedule of

the United States ("HTSUS"), that is, as gasoline (motor fuel).[1]  BP, however, asserts that the subject merchandise is properly classified under subheading 2707.50.00, HTSUS, because it was an oil product and its aromatic constituents exceeded nonaromatic constituents.[2]  For the reasons stated below, the court denies BP's motion for summary judgment and grants the Government's cross-motion for summary judgment.

## BACKGROUND

The parties agree on the underlying facts of this case.  (Def.'s Mem. In Supp. Of Its Cross-Mot. For Summ. J. And In Opp'n To Pl.'s Mot. For Summ. J. ("Def.'s Mem.") 2.)  In December 2004 and February 2005, BP imported a liquid mixture known as 93 octane (premium grade) conventional gasoline ("Conv. 93") into the United States from Germany.  (App. To Pl.'s Mem. In Supp. Of Its Mot. For Summ. J. ("Pl.'s App.") Tab B; Def.'s Statement Of Additional Material Facts As To Which There Are No Genuine Issues To Be Tried ("Def.'s Statement of

---

[1] The relevant portion of Chapter 27, Subheading 2710.11.15 of the HTSUS reads:

| 2710 | Petroleum oils and oils obtained from bituminous minerals, other than crude; preparations not elsewhere specified or included, containing by weight 70 percent or more of petroleum oils or of oils obtained from bituminous minerals, these oils being for basic constituents of the preparations; waste oils: |
| --- | --- |
| | . . . . |
| 2710.11 | Light oils and preparations: |
| | . . . . |
| 2710.11.15 | 　　　Motor fuel |

[2] The relevant portion of Chapter 27, Subheading 2707.50.00 of the HTSUS reads:

| 2707 | Oils and other products of the distillation of high temperate coal tar; similar products in which the weight of the aromatic constituents exceeds that of the nonaromatic constituents |
| --- | --- |
| | . . . . |
| 2707.50.00 | Other aromatic hydrocarbon mixtures of which 65 percent or more by volume (including losses) distills at 250°C by the ASTM D 86 method |

Court No. 06-00184                                                                                      Page 3

Facts") ¶ 1; Pl.'s Resp. To Def.'s First Interrogs. And First Req. For Produc. Of Doc. And Things ("Pl.'s First Interrogs.") 14, available at Def.'s Mem. Ex. A.)[3]  "Conv. 93 consist[ed] of a blended mixture of components and was likely prepared to satisfy particular specifications and to possess particular measured properties."  (Def.'s Statement of Facts ¶ 4.)  "Petroleum constitute[d] the basic constituent of the imported Conv. 93," which "contain[ed], by weight, 70 percent or more of petroleum oils."  (Def.'s Statement of Facts ¶¶ 2, 3; see also Dep. Of Tim McMahon ("McMahon Dep.") 45–46, available at Def.'s Mem. Ex. C.)[4]  Each cargo of Conv. 93 had an "aromatic hydrocarbon compound content . . . greater than 50% by weight, as measured and reported by BP's independent commercial gauger utilizing the American Society of Testing and Materials ("ASTM") D 5769 test method."[5]  (Pl.'s Statement Of Material Facts Not In Dispute ("Pl.'s Statement of Facts") ¶ 3.)  Conv. 93 "satisfie[d] the typical U.S. requirements for automotive motor fuel as set forth in ASTM D 4814, Standard Specification for Automotive Spark-Ignition Engine Fuel."  (Id. at ¶ 9.)  In addition, Conv. 93 was "capable of being used in automobile engines in its condition as imported."  (Def.'s Statement of Facts ¶ 7.)  Thus, it was

---

[3] After admitting eleven of the twelve facts initially submitted by BP, (see Def.'s Resp. To Pl.'s Statement Of Material Facts As To Which There Are No Genuine Issue To Be Tried), the Government submitted eight additional facts, including the statement that "[t]he imported product . . . is conventional gasoline," (Def.'s Statement of Facts ¶ 1).  Although BP did not formally admit these additional facts, it did not controvert them either.  Therefore, the court concludes they are admitted facts.

[4] At the time of his deposition, Tim McMahon was employed by BP as an international products trader.  (Id. at 11.)

[5] Aromatic is defined as "of, relating to, or characterized by the presence of at least one benzene ring — used of a large class of monocyclic, bicyclic, and polycyclic hydrocarbons and their derivatives (as benzene, toluene, naphthalene, phenol, aniline, salicylic acid) . . . ."  Webster's Third New International Dictionary 120 (Philip Babcock Gove et al. eds., 1981).

Court No. 06-00184                                                                                         Page 4

gasoline motor fuel.

Upon entry, BP classified Conv. 93 under subheading 2707.50.00, HTSUS, subject to no duty. (Pl.'s App. Tab A.) Customs, however, classified Conv. 93 under subheading 2710.11.15, HTSUS, at a duty rate of 52.5 cents per barrel, (id. at Tab B), and liquidated the entries accordingly, (see id. at Tab C). After liquidation, BP challenged this classification, but Customs denied its protests. (Id.) BP then commenced the present action. Both parties now move for summary judgment pursuant to USCIT Rule 56.

## STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(a). Summary judgment is appropriate if "there is no genuine issue as to any material fact," and "the movant is entitled to judgment as a matter of law." USCIT R. 56(c). The proper construction of a tariff provision is a question of law, and whether the subject merchandise falls within a particular tariff provision is a question of fact. Franklin v. United States, 289 F.3d 753, 757 (Fed. Cir. 2002). Where, as here, "the nature of the merchandise is undisputed, . . . the classification issue collapses entirely into a question of law," and the court reviews Customs' classification decision de novo. Cummins Inc. v. United States, 454 F.3d 1361, 1363 (Fed. Cir. 2006).

## DISCUSSION

**I. Heading 2710, HTSUS**

    **A. Conv. 93 is a preparation under heading 2710, HTSUS**.

Conv. 93 is a blended mixture of components, including at least seventy percent

Court No. 06-00184                                                                                                   Page 5

petroleum oils, that, once combined with certain additives,[6] may be sold as automobile gasoline in the United States. In its memorandum of law, BP admits that Conv. 93 is described by the terms of heading 2710, HTSUS, but contends that Conv. 93 is a petroleum oil, not a preparation. (Pl.'s Mem. Of Law In Supp. Of Its M. For Summ. J. ("Pl.'s Mem.") 5; Pl.'s Resp. To Def.'s Cross-Mot. For Summ. J. And Reply To Def.'s Resp. To Pl.'s Mot. For Summ. J. ("Pl.'s Resp.") 4 n.2.) BP argues that "[b]y failing to recognize that a basic blended nature is common to gasoline and substantially all petroleum fuels, defendant overreaches." (Pl.'s Resp. 2.) It argues "[p]etroleum products are not 'preparations' as opposed to 'oils' for tariff purposes simply because they consist of hydrocarbon streams that are blended to meet specifications."[7] (Id.) Rather, BP contends that the distinction between petroleum oils and preparations under heading 2710, HTSUS, is the inclusion of additives in the latter.[8] BP's claim lacks merit.

---

[6] Although these additives are not technically necessary to manufacture finished gasoline motor fuel, the ASTM D requires certain additives, such as ethanol, for the purpose of cleaning engines as they run. (McMahon Dep. 31–32.) Neal Byington, a national petroleum chemist within Customs, stated that the specifications of ASTM D 4814 must be met before gasoline motor fuel can be sold to the general public. (See Declar. of Neal D. Byington ("Byington Decl.") ¶¶ 1, 21.c, 24, available at Def.'s Mem. Ex. D.) Environmental regulations, however, do not control Customs classification. See North Am. Processing Co. v. United States, 236 F.3d 695, 698 (Fed. Cir. 2001) (providing that "USDA regulations are not dispositive" in Custom classification cases).

[7] BP argues that if the Government's understanding of preparations is correct, "the 'oils' portion of Heading 2710 would apply to virtually no products." (Id.) As made clear by the Explanatory Notes, however, this is not the case. See World Customs Organization, Harmonized Commodity & Coding System Explanatory Notes, Explanatory Note 27.10, 249 (3d. 2002) ("Explanatory Notes") (listing "gas-oils," "kerosene," and "fuel oils" under this first category of heading 2710, HTSUS).

[8] By additives, BP seems to mean components that are "almost universally not made directly from petroleum." (Pl.'s Resp. 5.) But preparations are not limited in the way BP asserts.
(continued...)

Court No. 06-00184                                                                                                    Page 6

Court No. 06-00184                                                                                                    Page 6

The General Rules of Interpretation ("GRIs") of the HTSUS govern the classification of merchandise entered into the United States. Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998). Under GRI 1, HTSUS, "classification shall be determined according to the terms of the headings and any relative section or chapter notes . . . ." Courts may use plain meanings and dictionary definitions to interpret these terms. See E.T. Horn Co. v. United States, 367 F.3d 1326, 1331 (Fed. Cir. 2004).

Heading 2710, HTSUS, includes "[p]etroleum oils and oils obtained from bituminous minerals, other than crude; preparations not elsewhere specified or included, containing by weight 70 percent or more of petroleum oils or of oils obtained from bituminous minerals, these oils being the basic constituents of the preparations; waste oils . . . ."[9] This heading, therefore, contains three distinct categories of merchandise as indicated by the placement of semicolons: 1) "petroleum oils and oils obtained from bituminous minerals, other than crude;" 2) "preparations not elsewhere specified or included, containing by weight 70 percent or more of petroleum oils or of oils obtained from bituminous minerals, these oils being the basic constituents of the preparations;" and 3) "waste oils." See Commercial Aluminum Cookware Co. v. United States, 938 F. Supp. 875, 883 (CIT 1996) (providing that semicolons create "separate independent clauses of a sentence").

---

[8] (...continued)
See, infra, note 14.

[9] Bitumen is defined as "any of various mixtures of hydrocarbons (as asphalt, crude petroleum, or tar) often together with their nonmetallic derivatives that are usu. dark brown or black and occur naturally or are obtained as residues from naturally occurring substances by heat refining." Webster's Third New International Dictionary 223 (Philip Babcock Gove et al. eds., 1981).

"Inherent in the term preparation is the notion that the object involved is destined for a specific use. The relevant definition from The Oxford English Dictionary defines preparation as a substance specially prepared, or made up for its appropriate use or application, e.g. as food or medicine, or in the arts or sciences." Orlando Food, 140 F.3d at 1441 (internal quotation marks and citation omitted). This understanding of the word "preparation" is further supported by the corresponding Explanatory Notes, which provide that heading 2710, HTSUS, includes "[t]he oils described . . . above to which various substances have been added to <u>render them suitable for particular uses</u> . . . ." Explanatory Notes at 249 (emphasis added). To determine whether Conv. 93 is a preparation or a petroleum oil under heading 2710, HTSUS, therefore, the court will consider the gasoline refinement process in order to determine if Conv. 93 was specially prepared for a specific use.[10] The description below has not been disputed.

---

[10] The court notes BP's frequent reference to the website http://wikipedia.org in its description of this process. (See Pl.'s Resp. 4–6.) Wikipedia is a "user-contributed online encyclopedia" compiled of articles placed on "[w]eb sites that allow users to directly edit any [w]eb page on their own from their home computer." Thomas L. Friedman, The World is Flat: A Brief History of the Twenty-First Century 94 (Farrar, Straus and Giroux 2005). Wikipedia's construction is based on the theory that "allowing anyone who surfs along to add or delete content on that page" will result in "a credible, balanced encyclopedia by way of an ad hoc open-source, open-editing movement." Id. Although the court is aware that some studies have led prominent scholars to promote Wikipedia's veracity, see Yochai Benkler, The Wealth of Networks: How Social Production Transforms Markets and Freedom 71–72 (Yale University Press 2006), and acknowledges that several circuit courts have relied on it in opinions, see, e.g., Tiffany (NJ) Inc. v. eBay, Inc., 600 F.3d 93, 96 n.1 (2nd Cir. 2010); United States v. Lane, 591 F.3d 921, 924 n.1 (7th Cir. 2010); Brown v. Nucor Corp., 576 F.3d 149, 156 n.9 (4th Cir. 2009), countless district courts have held that "Wikipedia is not a reliable source at this level of discourse," Kole v. Astrue, No. CV 08-0411-LMB, 2010 U.S. Dist. LEXIS 31245, at *18 n.3 (D. Idaho Mar. 31, 2010); see also Nuton v. Astrue, No. SKG-08-1292, 2010 U.S. Dist. LEXIS 30755, at *4 n.1 (D. Md. Mar. 30, 2010); Techradium, Inc. v. Blackboard Connect Inc., No. 2-08-CV-00214-TJW, 2009 U.S. Dist. LEXIS 36083, at *13 n.5 (E.D. Tex. Apr. 29, 2009); Capcom Co. v. MKR Group, Inc., No. C 08-0904 RS, 2008 U.S. Dist. LEXIS 83836, at *11

(continued...)

Court No. 06-00184                                                                                           Page 8

"Gasoline is a complex mixture of hundreds of different hydrocarbons" that is "derived from petroleum and used as fuel for internal combustion engines."  5 The New Encyclopædia Britannica 138 (15th ed. 1986).[11]  "In most cases, crude oil is unsuitable for direct use.  It is converted into such useful products as gasoline, motor oil, and petrochemicals through the refining process."  21 The New Encyclopædia Britannica 439 (15th ed. 1986).  "The primary refinery process is fractional distillation," id., which "consists of heating crude oil in a container . . . until it begins to boil and then continuing to heat the crude oil while collecting the condensation from the vapors," (Byington Decl. ¶ 21.a).  This methodology works because "[e]ach of the compounds in crude oil has its own unique boiling point . . . ."  (Id.)  The base material for the preparation of gasoline, called a "straight run distillation cut," consists of the compounds in crude oil that boil between approximately thirty-five and two hundred degrees Celsius.  (Id. at ¶ 22.)  Generally, this "straight run distillate" "has an aromatic content of less than 20 percent by weight."  (Id. at ¶ 25.)

"After physical separation into such constituents as gasoline, kerosene, and lubricating oils, selected petroleum fractions may be subjected to chemical conversion processes, such as cracking and reforming."  9 The New Encyclopædia Britannica 344 (15th ed. 1986).  "Both cracking and reforming can be brought about by simply heating the petroleum fraction to

---

[10](...continued)
(N.D. Cal. Oct. 10, 2008).  Based on the ability of any user to alter Wikipedia, the court is skeptical of it as a consistently reliable source of information.  At this time, therefore, the court does not accept Wikipedia for the purposes of judicial notice.

[11] Both parties cite to online versions of this source, which do not differ in a material way.  (See Pl.'s Statement of Facts 2; Def.'s Mem. 21–23; Pl.'s Resp. 15.)

high temperatures (thermal processes) or by bringing them into contact with certain reagents (catalytic process)."[12]  Id.  Refiners may "blend into this base 'straight run distillate' a variety of smaller volume 'blendstocks,'" which are "obtained by the refiner from other process units in the refinery or purchased on the open market."  (Byington Decl. ¶ 23)  "One of the ways refiners commonly increase the octane rating (anti-knock index) is to blend the 'straight run distillate' with aromatic compounds (compounds which contain benzene-like ring structures)."[13]  (Id. at ¶ 26.)  "One common method to prepare high octane finished premium gasoline with over 50 weight percent aromatic contents is to blend 100 percent aromatic blendstock, or other high aromatic content blendstock, into a 'straight run distillate' that has an aromatic percent content on a weight basis of 10-20 percent."[14]  (Id. at ¶ 27.)  Afterwards, a small amount of additives may be introduced.  5 Encyclopædia Britannica 138; 21 Encyclopædia Britannica 444.  As a result of these processes, finished gasoline motor fuel generally consists of fifty to seventy-five percent

---

[12] "In the most general terms, cracking breaks the large molecules of hard-to-use heavy oils into the smaller molecules that form their lighter, more valuable fractions.  Reforming changes the structure of a molecule without breaking it to pieces; the process is widely used to raise the octane number of gasolines . . . ."  Id.

[13] "The anti-knock characteristics of a gasoline—its ability to resist knocking, which indicates that the combustion of fuel vapour in the cylinder is taking place too rapidly for efficiency—is expressed in octane number."  5 Encyclopædia Britannica 138.  Generally speaking, the higher the octane number assigned to a gasoline, the better the quality.  (See McMahon Dep. 18–19).

[14] BP's witness acknowledged Byington's description as one possible gasoline manufacturing process and agreed that he did not have "any reason to believe that the merchandise in this instance wasn't produced pursuant to that process."  (McMahon Dep. 46–47.)  BP, however, criticizes Byington's declaration as "fail[ing] to provide any information about the crucial distinction between blending components and gasoline additives."  (Pl.'s Resp. 4.)  But preparations in 2710, HTSUS, are not limited to those which include a specific category of "additives."  Thus, this is not a crucial distinction.

Court No. 06-00184                                                                                      Page 10

"straight run distillation cut," by volume.[15]  (Byington Decl. ¶ 23.)

        Conv. 93 possesses an aromatic compound content of over fifty-percent by weight, although a typical straight run distillate possesses merely ten to twenty-percent.  (Pl.'s Statement of Facts ¶ 3; Byington Decl. ¶ 27.)  BP does not contend that Conv. 93 is derived from anything other than crude petroleum oil,  (McMahon Dep. 43), but "is unable to specify the exact blend components of [Conv. 93] due to the passage of time, lack of access to the independent foreign producer's records, and the inherently changing nature of petroleum blending," (Pl.'s First Interrogs. 8).  The only inference the court can draw logically from the undisputed facts is that a high aromatic content blendstock was added to a "straight run distillate" to create Conv. 93, high octane gasoline.[16]  Thus, Conv. 93 is a preparation, rather than a petroleum oil, under heading 2710, HTSUS, because the liquid has been specially prepared for a specific use.  See HQ 951428 (Apr. 14, 1994), available at 1994 WL 495852 (holding that a high-aromatic-content reformate is a preparation under heading 2710 despite containing no additives); HQ 088342 (Dec. 23, 1991), available at 1991 WL 425316 (holding that an imported motor fuel, in which the weight of the aromatic constituents exceed the weight of the nonaromatic constituents, is "a preparation to which a mixed blend of aromatics have been added, regardless of amount, (as well

---

[15] The percentage level varies depending on the desired octane of the gasoline being produced.  (Byington Decl. ¶ 23.)

[16] BP states that the fact "[t]hat the imported merchandise contained more aromatic than nonaromatic hydrocarbons [merely] indicates its utility as a higher end gasoline base stock or blending component."  (Id.)  BP presents no evidence or alternative theory as to how Conv. 93 comes to possess such a high aromatic content.  BP's position stems from its incorrect legal conclusion that, for the purposes of heading 2710, HTSUS, a blended gasoline is a petroleum oil. Accordingly, any disagreement that may exist on this point raises no genuine issue of material fact.

Court No. 06-00184                                                                                     Page 11

as other additives) to make the finished gasoline").

    **B.    The aromatic constituency limitation in Note 2 of Chapter 27, HTSUS, pertains only to "similar oils."**

    BP also claims that Conv. 93 cannot be classified under heading 2710, HTSUS, because Statutory Note 2 of Chapter 27 excludes petroleum oil in which "the weight of the nonaromatic constituents exceeds that of the aromatic constituents" from the heading. (Pl.'s Mem. 5–6, quoting Note 2 of Chapter 27, HTSUS.) Even if Conv. 93 is characterized as a preparation, rather than a petroleum oil, BP contends that " [Explanatory Note 27.10] (C) [which appears to apply to preparations] by its terms incorporates by reference the aromatics exclusion applicable to [Explanatory Note 27.10 oil] categories (A) and (B)."[17] (Pl.'s Resp. 2.) This claim lacks merit.

    Statutory Chapter Note 2 provides that:

References in heading 2710 to '<u>petroleum oils and oils obtained from bituminous</u>

---

[17] The relevant portion of the Explanatory Notes reads:

 The heading includes:
(A) "Topped crudes" (where certain lighter fractions have been removed by distillation), as well as light, medium and heavy oils obtained in more or less broad fractions by the distillation or refining of crude petroleum oils or of crude oils obtained from bituminous minerals. These oils, which are more or less liquid or semi-solid, consist predominantly of <u>non-aromatic</u> hydrocarbons such as paraffinic, cyclanic (naphthenic).
. . . .
(C) The oils described in (A) . . . above to which various substances have been added to render them suitable for particular uses, <u>provided</u> the products contain by weight 70 % or more of petroleum oils or of oils obtained from bituminous minerals as a basis and that they are not covered by a more specific heading in the Nomenclature.

Explanatory Notes at 249–50.

Court No. 06-00184	Page 12

> minerals' include not only petroleum oils and oils obtained from bituminous minerals, but also similar oils, as well as those consisting mainly of mixed unsaturated hydrocarbons, obtained by any process, provided that the weight of the nonaromatic constituents exceeds that of the aromatic constituents.

Note 2 of Chapter 27, HTSUS. This aromatic constituency limitation, therefore, has no application to petroleum oils because the exclusion applies only to the last antecedent, "similar oils." See Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1336 (Fed Cir. 2008) (stating that the doctrine of the last antecedent provides that "[r]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent, which consists of the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence" (internal quotation marks and citation omitted)).[18]

If aromatic constituency exclusion of Statutory Chapter Note 2 does not apply to petroleum oils under heading 2710, HTSUS, logically there is also no such limitation on preparations. Even if such a limitation were applicable to petroleum oils, there is nothing in the language of the Explanatory Notes to indicate that an exclusion contained in (A), covering oils, should be incorporated into (C), covering preparations. See Explanatory Notes at 249–50. It is clear that a product qualifies under (C) only if alterations to an oil of category (A) or (B) are made. Id. These qualifying changes may permit an increase in the aromatic constituency of a

---

[18] This interpretation is further supported by the Explanatory Notes, which characterize petroleum oils as "consist[ing] predominantly of non-aromatic hydrocarbons," but similar oils as "oils in which the weight of the non-aromatic constituents exceeds that of the aromatic constituents." Explanatory Notes at 249; see also HQ 088342 (stating that "it cannot be ignored that regardless of what might have been the drafters' intention in the chapter note, the language fails as a matter of grammatical construction to establish that the limitation does, in fact, apply to petroleum oils; rather it is concluded that the limitation modifies only the nearest antecedent: 'similar oils'").

substance. Here the non-binding Explanatory Notes are fully consistent with the statute. Regardless of whether Conv. 93 is a petroleum oil or a preparation under heading 2710, HTSUS, it is not subject to an aromatic constituent limitation. Accordingly, Conv. 93 is not excluded from heading 2710, HTSUS, by operation of Statutory Chapter Note 2. Furthermore, Additional U.S. Note 3 of Chapter 27, HTSUS, indicates Congress intended that, in general, motor fuels would be classified under heading 2710, HTSUS. U.S. Note 3 provides that "[f]or the purposes of subheading 2710.11.15, '<u>motor fuel</u>' is any product derived primarily from petroleum, shale or natural gas, whether or not containing additives, which is principally used as a fuel in internal-combustion or other engines." U.S. Chapter Note 3 to Chapter 27, HTSUS. Plaintiff has not demonstrated that this motor fuel must be classified elsewhere, specifically under heading 2707, HTSUS.

**II.     Heading 2707, HTSUS**

A preparation may be classified under heading 2710, HTSUS, however, only if it is "not elsewhere specified or included." BP claims that Conv. 93 is included under heading 2707, HTSUS, as a product "similar" to "[o]ils and other products of the distillation of high temperate coal tar . . . in which the weight of the aromatic constituents exceeds that of the nonaromatic constituents." (Pl.'s Mem. 11, quoting heading 2707, HTSUS.) Specifically, BP argues that "the 'similar products' clause . . . can be read simply as shorthand for 'predominantly aromatic products'" because "while every imported petroleum and petrochemical product must be classified [somewhere] in the [HTSUS], not every such product is contemplated by the express terms of the [various headings], and the classification provisions often must be construed

broadly enough to encompass actual products falling outside the [headings'] ostensible range." (Id. at 13, 14.)  BP encourages the court "to conclude that Congress did not intend that Customs or this Court should engage in a detailed inquiry regarding the extent to which a particular imported oil was 'similar' to oils and other products of the distillation of high temperature coal tar."[19]  (Id. at 14.)  Based on this view, BP did not attempt to demonstrate a factual similarity, relying instead on aromatic content.[20]  (See id.)  BP's claim fails.

---

[19] The entirety of BP's legal position is based on its belief that "Congress made the conscious decision to differentiate between those products that are predominantly aromatic (in Heading 2707) and those that are not (in Heading 2710)." (Id. at 14)  BP, therefore, interprets the structure of HTSUS Chapter 27 as only differentiating between predominantly aromatic products and predominantly nonaromatic products.  (See id. at 7.)  In support of its understanding, BP heavily relies on a sentence in the Explanatory Notes to heading 2710, HTSUS, which provides that "the heading does not include oils with a predominance by weight of aromatic constituents, obtained by the processing of petroleum or by any other process (heading 27.07)."  Explanatory Notes at 249.  Although this provision includes the general phrase "the heading," suggesting that the exclusion applies to heading 2710, HTSUS, in its entirety, the court notes this sentence's location within the Explanatory Notes.  This sentence is presented as a paragraph under section (B) and comes before section (C).  See id.  This is relevant because section (B) applies to "[s]imilar oils in which the weight of the non-aromatic constituents exceeds that of the aromatic constituents."  Id. (emphasis added).  Furthermore, the final paragraph of Explanatory Note 27.10 contains several generally applicable exclusions, yet lacks any similar provision.  See id. at 250–51.  Based on these observations, the court concludes that this sentence is limited to section (B) of Explanatory Note 27.10.  To the extent it reads otherwise, the Explanatory Notes are not binding.  Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994) ("[A] court may refer to the Explanatory Notes of a tariff subheading, which do not constitute controlling legislative history but nonetheless are intended to clarify the scope of HTSUS subheadings and to offer guidance in interpreting subheadings.").

[20] BP claims that "[t]he requisite similarity of such products fairly [is] presumed from their common organic hydrocarbon source, be it crude petroleum or coal tar, and from their manner of production, primarily consisting of distillation and blending." (Id.)  During oral argument, BP clarified that a finding of similarity may be based on content, production method, and source material.  Specifically, BP now contends that Conv. 93 is a "similar product[]" under heading 2707, HTSUS, because it is a highly aromatic mixture of materials that is produced by the distillation and blending of a common organic hydrocarbon source material.  (See id.)  If this
(continued...)

Court No. 06-00184                                                                                                     Page 15

By its plain language heading 2707, HTSUS, applies to "[o]ils and other products of the distillation of high temperature coal tar; similar products in which the weight of the aromatic constituents exceeds that of the nonaromatic constituents." If Congress intended heading 2707 to be a catch all for any predominantly aromatic substance produced by the distillation and blending of any organic hydrocarbon source, the limiting adjective "similar" would not be present. See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (holding that "a statute ought . . . to be so construed that . . . no clause, sentence, or word shall be superfluous, void, or insignificant"). The Heading and its Explanatory Notes indicate that "similar" under heading 2707, HTSUS, requires more than a mere predominance of aromatic constituents.[21] See

---

[20](...continued)
understanding of "similar" were adopted, however, the only real criteria for similarity would be aromatic constituency. The source material and production method characteristics, which apply to a vast array of products, add little to the definition that BP advances.

[21] The relevant portion of Explanatory Note 27.07 reads:

This heading covers:
(1) The oils and other products obtained by the distillation of high temperature coal tar in more or less broad fractions, which produces mixtures consisting predominantly of aromatic hydrocarbons and other aromatic compounds.
  These oils and other products include:
  - Benzol (benzene), toluol (toluene), xylol (xylenes) and solvent naphtha.
  - Naphthalene oils and crude naphthalene.
  - Anthracene oils and crude anthracene.
  - Phenolic oils (phenols, cresols, xylenols, etc.).
  - Pyridine, quinoline and acridine bases.
  - Creosote oils.
(2) Similar oils and products with a predominance of aromatic constituents obtained by the distillation of low temperature coal tar or other mineral tar, by the "stripping" of coal gas, by the processing of petroleum or by any

(continued...)

Court No. 06-00184                                                                                           Page 16

HQ951428 (Apr. 14, 1994) (holding that a high-aromatic-content motor fuel blending stock is a preparation under heading 2710, HTSUS, rather than a product under heading 2707, HTSUS, because "it is not a coal tar crude, but, rather, something more, one reformed for a special use" that is included under heading 2710, HTSUS).  The statutory language requires a similarity to products derived from coal tar distillation.  Accordingly, Conv. 93 is not classified as a "similar product[]" under heading 2707, HTSUS.

## CONCLUSION

For the aforementioned reasons, the court holds that Conv. 93 is properly classified as a preparation under heading 2710, HTSUS.  Furthermore, the record supports that it is an unleaded gasoline, properly classified under 2710.11.15.  Accordingly, BP's motion for summary judgment is denied and the Government's cross-motion for summary judgment is granted.

                                             /s/ Jane A. Restani
                                              Jane A. Restani
                                              Chief Judge

Dated: This 1st day of June, 2010.
       New York, New York.

---

    [21](...continued)
        other process.

Explanatory Notes at 247.

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
:
BP PRODUCTS NORTH AMERICA INC.,          :
                                         :
            Plaintiff,                   :
      v.                                 :      Before: Jane A. Restani, Chief Judge
                                         :
UNITED STATES,                           :      Court No. 06-00184
                                         :
            Defendant.                   :
_____   :

## **JUDGMENT**

This case having been submitted for decision and the court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

IT IS HEREBY ORDERED that Defendant United States' Cross-Motion for Summary Judgment is granted, and Plaintiff BP Product North America's Motion for Summary Judgment is denied. Customs' classification of the subject merchandise under subheading 2710.11.15, HTSUS, is sustained.

                                              /s/ Jane A. Restani
                                              Jane A. Restani
                                              Chief Judge

Dated: This 1st day of June, 2010.
      New York, New York.

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____  By: _____
                                      Deputy Clerk